**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| KRYSTYNA L. WALLS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 2:21-cv-68-JPK |
| KILOLO KIJAKAZI[1], Acting Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Krystyna L. Walls seeks review under 42 USC § 405(g) of the final decision of the Commissioner of Social Security (Commissioner) denying her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*. Plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the Court for review. *See* 20 C.F.R. §§ 404.955, 404.981. The parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c). [DE 10]. Plaintiff asks the Court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision. For the reasons that follow, the Court reverses and remands.

**BACKGROUND**

**A.   INTRODUCTION**

Plaintiff was born in1992 and was 8 years old in July 1996, when she alleges the onset of her disability. She was 26 years old when she filed her SSI application in April 2019, alleging she

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security effective July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner Kijakazi is substituted for Andrew M. Saul as the defendant in this suit.

is unable to work due to Pfieffer Syndrome Type 2, depression, anxiety, posttraumatic stress disorder (PTSD), vertigo, arthritis in the hands and feet, and asthma. [AR 60[2]]. Pfeiffer Syndrome is a rare genetic disorder characterized by premature fusion of certain skull bones (craniosynostosis), and abnormally broad and medially deviated thumbs and great toes, and Type 2 is characterized by a more severe form of craniosynostosis, with more severe hand and foot anomalies and additional malformations of the limbs.[3]

Plaintiff's fingers appear smaller than normal [AR 43, 350-352], and radiography indicates that Plaintiff has developmental anomalies in both hands consisting of a shortened and/or malformed first and third metacarpals[4] and first and second distal phalanges[5]. [AR 340, 360-361, 565-568]. The record indicates that Plaintiff also may have congenital deformities in her feet and spine. *See* [AR 505, 507 (noting foot pain, hypermobile ankles, and, at times, difficult and/or guarded ambulation, and cervical spine issues causing moderate pain with range of motion maneuvers of the lumbar spine)]. The ALJ addressed all of Plaintiff's alleged impairments in his decision, but Plaintiff only challenges the ALJ's findings with respect to her physical limitations caused by the congenital deformities in her hands. Accordingly, the following discussion describes the evidence that was before the ALJ relating to that issue.

---

[2] Record citations are to the Administrative Record ["AR"] located at Docket Entry #18 and the Bates stamp page numbers at the lower right corner of each page.

[3] *See https://rarediseases.org/rare-diseases/pfeiffer-syndrome/* (last visited on 9/20/2022).

[4] "The metacarpal bones are the long slender bones which connect your wrist to your fingers and are roughly at the level of your palm. There is one metacarpal for each finger." *https://handinstituteofcharleston.com/conditions-treatments/metacarpal-fracture/* (last visited on 9/20/2022).

[5] "Phalanges: The bones of the fingers and of the toes. There are generally three phalanges (distal, middle, proximal) for each digit except the thumbs and large toes." *https://www.medicinenet. com/phalanges/definition.htm* (last visited on 9/20/2022).

### B.   PRE-FILING MEDICAL RECORDS

In July 2018, Plaintiff was treated for pain in her right hand by Family Nurse Practitioner Sarah L. Brentlinger. Plaintiff described the pain as "feel[ing] like her fingers are popping out of place," stating that she was "barely able to use her hand." [AR 341]. NP Brentlinger noted that Plaintiff was experiencing joint pain, joint swelling, and mild pain associated with moving the right hand. An x-ray was taken, which revealed the congenital deformities described earlier. The x-ray also confirmed that there was no fracture or other acute abnormality that could account for Plaintiff's symptoms. Observing that Plaintiff had a musculoskeletal deformity, the only treatment it appears NP Brentlinger recommended at that time was warm Epsom salt soaks.

### C.   CONSULTATIVE EXAMINATIONS

After filing her SSI application in April 2019, Plaintiff was promptly referred for two consultative examinations. The first was a physical consultative examination, which took place on August 14, 2019. The consultative examiner, Dr. R. Gupta, provided the following history of Plaintiff's physical complaints:

> [The patient] is a 26-year-old female who was diagnosed with type II Pfeiffer syndrome type 2 in 2009 but has had it since birth. Patient has deformed hands, fingers and toes, but the hands are worse. The patient suffers with severe joint pain and swelling causing her to have difficulty grasping and holding objects. The patient also complains of having pain and swelling in her feet causing her to have difficulty walking and standing. The patient was also diagnosed with having arthritis in her back, hands and feet in 2009 which was confirmed with x-rays. The patient states that she has a lump on the back of her neck that causes pain when turning her head. The patient is not taking any medication at this time …. Patient drove herself to the exam.

[AR 345].

For his examination of Plaintiff's upper extremities, Dr. Gupta reported anatomical deformities to, and pain and stiffness in, both hands and fingers. He noted that Plaintiff had a full

3

range of motion in the upper extremity, but that her strength was 3/5 in all upper major muscle groups. He reported that Plaintiff's grip strength was 3/5 bilaterally with abnormal fine finger manipulative abilities, including having difficulty buttoning, zipping, and picking up coins. Dr. Gupta also conducted dynamometer testing,[6] reporting that Plaintiff scored a 9.7 on the right hand and 8.2 on the left hand. [AR 347].[7] In the concluding "Medical Source Statement" portion of the report, Dr. Gupta opined in relevant part as follows:

> Claimant is unable to do work related activities such as difficulty sitting and is unable to do work related activities such as standing, walking, lifting, carrying and handling objects due to pain and deformities in both hands and shortness of breath.

[AR 348].

The following day, on August 15, 2019, Plaintiff appeared for a mental status consultative examination with Dr. Gary M. Durak. While Dr. Durak's report relates to Plaintiff's psychological symptoms and impairments, he noted as part of his examination that Plaintiff suffered from bilateral hand pain with a chronic pain level of 8 out 10. [AR 355].

### D.   SEPTEMBER 2019 NURSE CONSULTATION AND INITIAL AGENCY REVIEW

On September 12, 2019, Plaintiff saw NP Brentlinger with complaints once again of bilateral hand pain. Plaintiff reported the pain started two weeks earlier and that she was having a difficult time opening lids. [AR 384]. The record includes x-rays from this date with similar findings to the x-rays taken in July 2018, and, again, no finding of fracture or other acute

---

[6] A hand dynamometer is an evaluation tool used to measure hand grip strength. *See https://www. performancehealth.com/articles/faq-about-using-hand-dynamometers-for-grip-strength-testing?/* (last visited on 9/20/2022).

[7] One dynamometer manufacturer gives the following pertinent guidelines for test scoring: A female in the 25-29 age range has a weak grip strength if she scores below around 25.6 kilograms, while a normal range for a 10-11 year old child (both sexes) is 11-22 kilograms. *See https://www.topendsports. com/testing/norms/handgrip.htm* (last visited on 9/20/2022).

abnormality. NP Brentlinger prescribed naproxen and referred Plaintiff to a hand surgeon for evaluation and treatment. [AR 387].

September 12, 2019 also is the date on which the SSA conducted its initial review of Plaintiff's SSI application. The agency reviewer considered Plaintiff's medical records through that date, including the September 12, 2019 x-rays and treatment notes, two Function Reports that had been completed by Plaintiff and Plaintiff's partner with whom she lived, and the two consultative reports. The agency reviewer acknowledged Plaintiff's congenital abnormalities in her hands as shown in the hand x-rays, as well as her complaints of pain and edema of the hands and decreased grip strength. But the reviewer indicated these findings were counterbalanced by Plaintiff's reports that she was "able to play video games, do puzzles, care for [her] pet and perform essentially all household tasks." [AR 67]. The agency reviewer also observed that there were "[n]o ongoing OVs [office visits] for severe debility/severely impacted ffm [fingering (fine manipulation)] as [were] noted in [the] one time imce [Dr. Gupta's consultative examination]," which the reviewer said found fingering limitations that were "disproportionately worse than in [the] rest of [the] ME [medical evidence of record]." [*Id.*]. Based on this analysis, the agency reviewer determined that Plaintiff had no limitations in handling (gross manipulation), and that she was capable of "frequent" fingering (fine manipulation). [AR 67].

### E.   ORTHOPEDIC SURGEON CONSULTATION

Pursuant to a referral by NP Brentlinger, Plaintiff was seen on October 14, 2019 by orthopedic surgeon Dr. Judson Wood, Jr. for a consultation regarding her hand pain. [AR 370]. Dr. Wood examined Plaintiff's hands and reviewed her hand x-rays. On examination, he wrote: "All the digits [are] presen[t] but there is gross deformity of both hands." [AR 364]. On review of the x-rays, Dr. Wood wrote: "X-rays reveal congenital deformities with failure to develop of [sic]

5

both hands involving the metacarpals as well as the phalanges." *Id.* Dr. Wood diagnosed Plaintiff with arthralgia (joint pain) of both hands, and opined that he "d[id] not feel there [was] any surgical treatment at this time that would really help her deformity. Unfortunately, … she will most likely have to live with this." [*Id.*]. Dr. Wood further opined,

> I expect the patient to be disabled as a result of this deformity as she has limited function and associated pain with the deformities. I will recommend she be considered disabled and she will really be unable to perform any kind of duties or activities that would require significant lifting[,] pushing[,] pulling or any activities [that] require[ ] dexterity with the use of the hands.

[*Id.*].

Plaintiff reported back to NP Brentlinger that Dr. Wood told her that surgery was too high risk and that he suggested she seek an appointment with a pain specialist. [AR 389]. In response, NP Brentlinger referred Plaintiff to Dr. Simon G. Ho, at the Centers for Pain Control. [AR 394].

### F.   PAIN MANAGEMENT TREATMENT

Plaintiff was seen for an evaluation by Dr. Ho on November 12, 2019. Dr. Ho noted Plaintiff's history of having been diagnosed with Pfeiffer Syndrome Type 2 and her reports of "lifelong problems with pain primarily in the hands and feet bilaterally" as well as "significant problems with headaches." [AR 505]. Plaintiff rated the pain in her hands a 9 out of 10. Dr. Ho wrote in his assessment that Plaintiff has "significant congenital deformities which has been causing significant pain for her. She has been unable to work and has the pain in the hands bilaterally." [AR 507]. Dr. Ho discussed possible treatment options, but reported he "cannot think of any particular exercise that would be helpful nor [could] [he] think of any particular types of interventions in this area except for surgical intervention but she has been following up with some surgeons and has been told there are not good options there." [*Id.*]. In terms of medical options for pain, he said "we can use nonnarcotic medications as well as the possibility for some more

significant opiate medications as well." [*Id.*]. But he was "a little hesitant" to prescribe opiates because "the patient self-medicates significantly with marijuana," which "does not go well with the controlled substance management." [*Id.*].[8] In light of this assessment, Dr. Ho concluded: "I advised the patient to do some particular exercises but beyond that, I am not sure what else I am able to do. This being the case, she will see me on an as needed basis." *Id.*

On November 14, 2019, Plaintiff had a follow-up visit with NP Brentlinger at which she reported that Dr. Ho only prescribed naproxen for her pain. Nurse Brentlinger advised Plaintiff to get a second opinion. [AR 462]. On November 22, 2019, Plaintiff consulted with Dr. Nikhil A. Shetty at the St. Mary Medical Center Pain Clinic. In the History of Present Illness section of her notes, Dr. Shetty reported that Plaintiff experienced increased hand pain with working in her job over a long period of time. [AR 561]. Plaintiff described "deep aching pains" and also a "dull aching over the first MCPs bilaterally." [*Id.*]. A focused muscular skeletal examination revealed "[b]ilateral hands with soreness and aching over the distal phalanx over the first 2 digits bilateral hands—pain is increased with grip strength and squeezing." [AR 563]. No weakness in wrist dorsiflexion or grip strength was noted. [*Id.*]. Dr. Shetty prescribed a topical analgesia for the pain. [AR 564].

### G.    AGENCY REVIEW (RECONSIDERATION)

The second agency reviewer denied Plaintiff's SSI application at the reconsideration level on November 21, 2019. The reviewer considered Plaintiff's additional medical records from the

---

[8] In contrast to Dr. Ho's note about Plaintiff's marijuana use, Plaintiff had reported to Dr. Durak three months earlier that she smoked marijuana on a daily basis for a period of a year between ages 24 and 25, that her last use was in October 2017, that she did not use any other illicit substances, and that she currently used only CBD oil. [AR 355-356].

orthopedic surgeon and pain management consultants, but concurred with the initial reviewer's findings without any further comment or analysis.

### H.    CONTINUING CARE THROUGH SPRING 2020

Plaintiff had a follow-up appointment with Dr. Shetty on December 20, 2019 at which she reported that she had been using the topical ointment Dr. Shetty had prescribed with good results. She reported that her hands were less painful and swollen, and denied experiencing any side effects from the medication. [AR 557]. But at an appointment with NP Brentlinger two months later on February 27, 2020, Plaintiff again complained of joint pain as well as fatigue. [AR 429-430]. NP Brentlinger ordered some additional tests and referred Plaintiff to a rheumatologist for evaluation and treatment. [AR 430].

At another follow-up appointment with Dr. Shetty on March 6, 2020, Plaintiff reported that she continued to have bilateral hand pain that was only "marginally improved" with the topical analgesia. [AR 553]. She also experienced symptoms that the doctor described as "raynauds[9] in the bilateral hands." [*Id.*]. Dr. Shetty noted that Plaintiff had a rheumatology appointment "to discuss her varied complaints," and also recommended that she go for paraffin wax treatments for her hands. [AR 556].

Plaintiff saw rheumatologist Dr. Kirk D. Jenkins on May 5, 2020 with complaints of Raynaud's and in need of "management of her cyanotic[10] hand syndrome." [AR 582]. Plaintiff

---

9 "Raynaud's (ray-NOSE) disease causes some areas of your body—such as your fingers and toes—to feel numb and cold in response to cold temperatures or stress. In Raynaud's disease, smaller arteries that supply blood to your skin become narrow, limiting blood flow to affected areas (vasospasm)." *https://www.mayoclinic.org/diseases-conditions/raynauds-disease/symptoms-causes/syc-20363571* (last visited on 9/20/2022).

10 "Peripheral cyanosis is when the hands, fingertips, or feet turn blue because they are not getting enough oxygen-rich blood." *https://www.medicalnewstoday.com/articles/322560* (last visited on 9/22/2022).

reported that she experienced pain in multiple joints, but that the bilateral hand pain was the worst. She stated that, "with cold weather she will note triphasic color changes in the hands consistent with Raynaud's, which worsens her overall symptoms." [*Id.*]. Dr. Jenkins observed that Plaintiff had extremely mal-developed digits in the bilateral hands, but that she was without any signs of active inflammatory arthritis. [AR 582]. He recommended treatment for Raynaud's disease with a nitroglycerin ointment.[11] [AR 586]. He also assessed Plaintiff with osteoarthritis,[12] and noted that her joint pain was "secondary to her genetic disorder causing severe degenerative arthritis," but stated she was "not a candidate for immunosuppression," and he did "not think she would benefit from DMARDs/biologic therapy." [*Id.*].

In a telemedicine consultation with Dr. Shetty on May 14, 2020, Plaintiff reported that she continued to have bilateral hand pain symptoms that are increased with use of her hands. The notes indicate that she was taking naproxen and going for paraffin wax therapy, which helped with her pain. She was also using Voltaren gel, and that helped with pain and "allowed her to carry on with her ADL [activities of daily living] both basic and advanced." [AR 524]. Dr. Shetty recommended that Plaintiff continue with the naproxen, now 500 mg per day, as well as the Voltaren gel she had prescribed, and also referred Plaintiff for an occupational therapy evaluation.

## I. OCCUPATIONAL THERAPY

Plaintiff was evaluated by an occupational therapist on May 21, 2020. The therapist noted that "patient presents with pain, limited ROM [range of motion] and decrease[d] strength"; that

---

[11] At a follow-up visit with Dr. Jenkins on June 18, 2020, Plaintiff reported that insurance would not pay for the nitroglycerin ointment. Dr. Jenkins started her on a blood pressure medication instead for treatment of her Raynaud's symptoms.

[12] Osteoarthritis is a degenerative joint disease that affects the tissues of the joints by degrading cartilage, changing bone shape, and causing inflammation, resulting in pain, stiffness and loss of mobility. *https://www.arthritis.org/disease/osteoarthritis* (last visited on 9/20/2022).

"[patient's] fingers are all different lengths"; that "[s]he has difficulties with fine motor skills such as button[ing], opening packages, etc."; and that "[her] hand[s] are weak and she complain[s] of pain in [the] hand[s] all the time." [AR 546]. The therapist was seeing Plaintiff "for adaptive equip[ment] and safety to increase function in self[-]care, feeding and homemaking task[s]." [*Id.*; *see also* AR 547 ("Needs assistance with ADLs [Activities of Daily Living] [and] … with IADLs [Instrumental Activities of Daily Living]"[13]). The therapist scored Plaintiff at 65.9% for level of occupational therapy impairment, and noted her reported pain was a 6 in intensity; of chronic duration; occurs daily; is described as aching, weakness, tightness, and pins and needles; is aggravated by gripping or lifting objects; and is relieved by massage and medication. [AR 547]. After an initial assessment, the therapist diagnosed Plaintiff with bilateral, generalized muscle weakness, lack of coordination, muscular wasting and atrophy, sensory deficits, muscle stiffness, and muscle, tendon and/or fascia injury affecting the wrist, hand, and elbow with physical performance deficits in coordination, strength, endurance, pain, range of motion and sensation, which limit her ADLs and IADLs and affect her rest, sleep, and education. [AR 550]. The therapist recommended occupational therapy appointments twice per week for 4 weeks and gave Plaintiff a "fair" prognosis. [*Id.*].

At the next occupational therapy appointment, Plaintiff reported pain in her right hand, which the therapist relieved with fluidotherapy and palpitations applied to tight hand muscles, which caused 'mild discomfort" to Plaintiff but resulted in a decrease in pain and stiffness. [AR

---

[13] In Occupational Therapy, ADLs refer to activities that are oriented toward taking care of one's own body, such as bathing/showering, toileting, dressing, and feeding, while IADLs refer to activities that are oriented toward interacting with the environment, like caring for pets, meal preparation and clean up, financial management, and driving or community mobility. *See https://www.verywellhealth.com/what-are-adls-and-iadls-2510011* (last visited on 9/20/2022).

544]. During the session, Plaintiff practiced using adaptive equipment to promote independence with functional activities such as buttoning and using a knife. [AR 543].

At the next therapy session three days later, Plaintiff reported being in severe pain in the right hand for the past few days. Moist heat was applied to relax the muscles. Plaintiff reported the lessening of pain after soft tissue mobilization was performed, and she was able to open and close her hand without pain by the end of the session. An ultrasound was attempted, but Plaintiff was unable tolerate the pain. [ARE 541].

The following session, Plaintiff reported using the treatment modalities she had learned in previous sessions at home with a decrease in right hand pain. An increase in left hand pain at the start of the session was decreased after soft tissue mobilization. Plaintiff practiced using her adaptive utensils during the session, and had difficulty gripping the knife and fork at the same time. [AR 539].

At the fifth occupational therapy session, Plaintiff reported a decrease in pain to her right hand. However, tightness in both hands and forearms continued during the session, which decreased after soft tissue mobilization. Plaintiff stated that she would like to try more during the session that day because her hands were not as sore. Plaintiff completed a large peg activity requiring her to pick up and place pegs on a board and then remove them with a "reacher" while standing. Plaintiff was able to pick up all the pegs, but had to utilize two hands to stabilize the "reacher." Plaintiff also engaged in a card sorting task that required her to pick up cards, reach, and then place the cards with Velcro. Plaintiff reported pain in her hand and asked for heat at the end of the session. [AR 537].

At her final session,[14] Plaintiff again reported a decrease in pain to the right hand. But Plaintiff was unable to complete the peg activity using both hands. [AR 533]. She also required extra time and rest breaks to complete the cards and Velcro task, and reported increased pain from pressure to her hands when attempting to cut with scissors or twist nuts onto bolts. [AR 533-34].

J. **HEARING TESTIMONY**

The hearing on Plaintiff's SSI application before the ALJ took place on August 6, 2020. Plaintiff testified that she has never had a driver's license and could not pass the driver's test due to the deformities in her hands. Her only jobs were in 2017 and 2018 when she worked for McDonald's and then at a factory. She stopped working at the factory because it was causing too much pain with her hands. She quit her previous job at McDonald's because she could not perform the job adequately and without danger to herself. She started out as a cook but she could not hold the cooking utensils properly and continually burned herself. She was moved to the food preparation table, but she could not use the tongs to get food out of the cabinets. She was then moved up front, but she was not fast enough.

Plaintiff testified she is unable to work because she cannot even get through a day at home without suffering extensive pain, let alone work an eight-hour shift. She explained that when she was a child she was able to use her hands for longer periods at a time. But when she worked at the factory, she overused her hands so that they now hurt too much to work. Because her fingers are smaller than normal, they swell very easily. She testified that she has difficulty doing things around the house that require using her hands, like washing dishes, opening medication bottles or bottles

---

[14] Plaintiff declined to attend the remaining two sessions authorized by her insurance. Although she did not explain her reasons at the time of cancelling with the occupational therapist, the ALJ asked her during the hearing why she cancelled and she explained that the sessions were too painful for her hands.

of soda, and brushing her hair. She cannot use a pen or pencil to write, and she avoids holding glassware because it might slip out of her grasp and break. In some instances, she gets around her disability by using special instruments, like silverware or a razor with larger than normal grips on them.

After Plaintiff concluded her testimony, the ALJ called the vocational expert (VE) to testify. The ALJ presented the residual functional capacity he ultimately assigned to Plaintiff as a hypothetical individual, and asked the VE to give his opinion whether such an individual could perform a significant number of jobs in the national economy. The VE testified that such an individual could perform three different jobs, which totaled 71,000 in the national economy. Plaintiff's attorney then asked the VE if an individual limited to "less than occasional fingering" and "occasional handling" could perform the identified jobs. The VE testified that such an individual could perform no jobs in the national economy.

## FIVE-STEP EVALUATIVE PROCESS

To be eligible for Social Security disability benefits, a claimant must establish that she suffers from a "disability," which is defined as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The ALJ follows a five-step inquiry to determine whether the claimant is disabled. The claimant bears the burden of proving steps one through four, whereas the burden of proof at step five is on the ALJ. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

At the first step, the ALJ asks whether the claimant has engaged in substantial gainful activity during the claimed period of disability. An affirmative answer at step one results in a

finding that the claimant is not disabled and the inquiry ends. If the answer is no, the ALJ moves

on to the second step, where the ALJ identifies the claimant's physical or mental impairments, or

combination thereof, that are severe. If there are no severe impairments, the claimant is not

disabled. If there are, the ALJ determines at the third step whether those severe impairments meet

or medically equal the criteria of any presumptively disabling impairment listed in the regulations.

An affirmative answer at step three results in a finding of disability and the inquiry ends.

Otherwise, the ALJ goes on to determine the claimant's residual functional capacity (RFC), which

is "an administrative assessment of what work-related activities an individual can perform despite

her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). At the fourth step of

the inquiry, the ALJ determines whether the claimant is able to perform past relevant work given

the claimant's RFC. If the claimant is unable to perform past relevant work, the ALJ determines,

at the fifth and final step, whether the claimant is able to perform any work in the national

economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). A positive answer at step

five results in a finding that the claimant is not disabled while a negative answer results in a finding

of disability. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); 20 C.F.R.

§ 404.1520(a)(4).

## THE ALJ'S DECISION

The ALJ made the following findings relevant to Plaintiff's arguments in this appeal:[15]

> 1.     The claimant has not engaged in substantial gainful
> activity since April 29, 2019, the application date.[16]

> 2.     The claimant has the following severe impairments:
> major joint dysfunction of the hands, obesity, asthma, depression,

---

[15] The paragraphs listed herein correspond with the paragraphs in the ALJ's decision.

[16] The relevant date is the application date because SSI is only payable beginning on the first month
following the month in which the application was filed. *See* 20 C.F.R. § 416.335.

anxiety, post-traumatic stress disorder (PTSD), and intellectual disorder.

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.     The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) except she can frequently handle and occasionally finger, but no repetitive fingering, such as frequent typing or frequent work with small objects. She can frequently climb ramps and stairs, as well as frequently balance, stoop, kneel, crouch, and crawl. She can occasionally work in dust, odors, fumes, and pulmonary irritants. She can never climb ladders, ropes, or scaffolds; never work at unprotected heights; never around dangerous machinery with moving mechanical parts; and never operate a motor vehicle as part of her work-related duties. She is limited to simple work-related decisions, and simple routine, tasks with no assembly line work or strictly-enforced daily production quotas.

5.     The claimant has no past relevant work (20 C.F.R. § 416.965).

6-8.     The claimant was 26 years old at the time of her application, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant has at least a high school education. Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including furniture rental clerk, usher, and surveillance system monitor.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since April 29, 2019, the date the application was filed.

*See* [AR 10-24].

## STANDARD OF REVIEW

The question before the Court upon judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) is not whether the claimant is in fact disabled, but whether the ALJ's decision "applies the correct legal standard and is supported by substantial evidence." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); 42 U.S.C. § 405(g). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)). Apart from a legal error, however, the Court must accept the Commissioner's factual findings as conclusive if they are supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). The ALJ must articulate an analysis of the evidence to allow the reviewing court to trace the path of reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ also has a basic obligation to develop a full and fair record, and he or she "must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

<u>**ANALYSIS**</u>

Plaintiff raises two arguments for reversal of the Commissioner's decision: (1) the ALJ failed to provide a reasonable explanation for dismissing the disabling opinions of Plaintiff's treating orthopedist, Dr. Wood, and the Consultative Examiner, Dr. Gupta; and (2) the VE's testimony was insufficient to establish that a "significant number" of jobs exist in the national economy which a person with Plaintiff's RFC is capable of performing. The Court reverses and remands on the basis of Plaintiff's first argument and does not address the second issue regarding the VE's testimony.

As previously noted, the RFC is "an administrative assessment of what work-related activities an individual can perform notwithstanding her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). When determining the claimant's RFC, the ALJ must consider both the medical and non-medical evidence in the record. *Id.* "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ... and nonmedical evidence. ... The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, *Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *7 (SSA July 2, 1996).

In the portion of the ALJ's RFC assessment challenged by Plaintiff here, the ALJ determined that Plaintiff could perform work that required "frequent" handling and "occasional" fingering. In general, "'[h]andling' is 'gross manipulation' and 'fingering' is 'fine dexterity.'" *Greenwood v. Barnhart*, 433 F. Supp. 2d 915, 926 (N.D. Ill. 2006); *see also Cannon v. Harris*, 651 F.2d 513, 518 (7th Cir. 1981); *Samuel S. v. Berryhill*, No. 1:18-cv-990-MJD-SEB, 2019 WL 168437, at *7 (S.D. Ind. Jan. 11, 2019). A restriction of frequent handling means that the person

can perform work tasks involving that skill up to two-thirds of the work-day or a total of 6 hours in an eight-hour day. *See* SSR 83-10, *Titles II & XVI: Determining Capability To Do Other Work-The Medical-Vocational Rules Of Appendix 2*, 1983 WL 31251, at *6 (S.S.A. 1983). A restriction of occasional fingering means the person can perform a work task involving that skill up to one-third of an eight-hour work-day or just over 2 hours in an eight-hour day. *Id.* at *5. Here, the VE testified that an RFC restriction to less than frequent handling or less than occasional fingering would lead to a finding that Plaintiff is unable to perform any jobs in the national economy. [AR 54-55]. Hence, the ALJ's RFC findings that Plaintiff can perform jobs requiring frequent handling and occasional fingering were crucial to his determination that Plaintiff was not disabled.

In arguing that the ALJ's RFC findings of frequent handling and occasional fingering are not supported by substantial evidence, Plaintiff points to the two medical opinions in the record. First, Dr. Gupta, the consultative examiner, opined that Plaintiff is "unable to do work related activities such as … carrying and handling objects due to deformities in both hands." [AR 348]. Second, Dr. Wood, an orthopedic specialist, opined that Plaintiff "has limited function and associated pain with the deformities" in her hands, and that, Plaintiff is "unable to perform any kind of duties or activities that would require significant lifting[,] pushing[,] pulling[,] or any activities [that] require[ ] dexterity with the use of the hands" [AR 364]. Thus, both Plaintiff's treating specialist and the agency's consultative examiner, who was contracted to examine and opine on Plaintiff's limitations, were in agreement with regard to Plaintiff's hand limitations. "[A]n ALJ is not required to credit" either "the agency's examining physician" or "the claimant's treating physician" where there is "a contrary opinion from a later reviewer or other compelling evidence" for not doing so. *Beardsley*, 758 F.3d at 839. But specialization is one of the enumerated factors ALJs consider when evaluating a medical opinion from a treating source. *See* 20 C.F.R.

§ 416.920c(c)(4). And "rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled, as happened here, can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step." *Beardsley*, 758 F.3d at 839. Yet the ALJ found Dr. Wood's opinion to be "less persuasive." [AR 21]. The ALJ also found Dr. Gupta's opinion to be "unpersuasive." [AR 22]. Plaintiff argues that the ALJ failed to provide logical reasons "for rejecting the agreement of doctors on both sides," and instead "substitute[d] his own impermissible medical opinion for the agreeing opinions." [DE 25 at 9]. For this reason, Plaintiff asserts, the ALJ's RFC findings of frequent handling and occasional fingering are not supported by substantial evidence. As discussed below, the Court agrees.

### A.   STANDARD FOR EVALUATING MEDICAL OPINIONS

The Commissioner points out that, because Dr. Gupta is a state agency consultant, his opinion (like that of the state agency reviewers) technically falls under the category of a "prior administrative medical finding" rather than a medical opinion. *See* 20 C.F.R. § 416.913(a)(5). The SSA regulations relevant to an ALJ's evaluation of the opinions of a consultative examiner state as follows:

> Administrative law judges are responsible for reviewing the evidence and making administrative findings of fact and conclusions of law. They will consider prior administrative medical findings and medical evidence from our Federal or State agency medical or psychological consultants as follows:
>
> > (1) Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 416.920b, 416.920c, and 416.927, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation.

*Id.* § 416.913a(b)(1). The cited rules for assessing a prior administrative finding (*id.* §§ 416.920b, 416.920c, 416.927) are the same rules applicable to medical opinions. Accordingly, because this

19

claim was filed after March 27, 2017, the ALJ was required to follow 20 C.F.R. § 416.920c in evaluating both Dr. Gupta's and Dr. Wood's opinions.[17]

Section 416.920c eliminates the requirement under the old rule that the Commissioner give "controlling weight" to an uncontroverted treating medical opinion. *See id.* § 416.927(c)(2). Apart from this change, the new rule requires the Commissioner to consider the same factors as before in weighing medical opinions. The factors are: (1) supportability used by the medical source to support the opinion; (2) consistency of the medical opinion with the other evidence in the record; (3) relationship with the claimant, including the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship; (4) specialization of the medical source; and (5) other factors that tend to support or contradict a medical opinion. *Id.* §§ 416.920c(c)(1)-(5). The new regulations state that supportability and consistency are the most important factors to consider, and that the other three factors only require discussion if it is appropriate for the determination. *Id.* § 416.920c(b)(2). The regulations provide that when an ALJ is looking at the supportability and consistency of a medical opinion, those terms mean:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

---

[17] Since the same rule applies, the Court will refer to the reports of Dr. Gupta and Dr. Wood as "medical opinions," rather than using the technically correct label of "prior administrative medical findings" for Dr. Gupta's report.

*Id.* §§ 416.920c(c)(1)-(2); *see also id.* § 416.920b(b) ("…. We consider evidence to be insufficient when it does not contain all the information we need to make our determination or decision. We consider evidence to be inconsistent when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques.").

### B.    DR. GUPTA

Although the ALJ acknowledged that, as a consultative examiner, Dr. Gupta has disability program knowledge and also examined Plaintiff, the ALJ still found that Dr. Gupta's opinion was unpersuasive, stating that it was not supported by Dr. Gupta's own examination of Plaintiff and was not consistent with other evidence in the record. While "[m]edical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence" in the record, *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995), the ALJ here did not adequately articulate his findings of inconsistency or else cited to evidence that does not actually show any inconsistency.

To begin with, the ALJ found an inconsistency between Dr. Gupta's opinions that Plaintiff had difficulty sitting and could not do the work-related activities of standing and walking, on the one hand, and his own examination and other evidence in the record regarding Plaintiff's ability to sit, walk, and stand, on the other hand. The ALJ then seemed to rely on that inconsistency to dismiss Dr. Gupta's *entire* opinion, including his opinion regarding Plaintiff's limitations in handling and fingering. *See* [AR 22 ("The record does not indicate the claimant has any limitations in her ability to sit. She is able to stand and walk, as evidenced by her normal, independent gait, full lower extremity motor strength, and generally unremarkable pulmonary signs.")]. The inconsistency the ALJ found does not constitute substantial evidence for rejecting Dr. Gupta's

opinions regarding the outcome determinative question in this case of whether Plaintiff can handle on a "frequent" basis or finger on an "occasional" basis.

As to the issue of fingering and handling, the ALJ acknowledged the relevant portion of Dr. Gupta's opinion that Plaintiff is "unable to do work related activities such as … lifting, carrying, and handling objects due to pain and deformities in both hands …." [AR 22]. But the ALJ found this part of Dr. Gupta's opinion also was inconsistent with the record because, according to the ALJ, the evidence showed that Plaintiff "is not completely unable to lift, carry, or handle objects." [*Id.*]. The ALJ then gave examples, citing to Plaintiff's testimony that she could lift up to 15-20 pounds without pain, and her reports that she could "handle personal hygiene, cook, do household chores, and play video games." [*Id.*]. There are several problems with this assessment of Dr. Gupta's opinion.

First, Plaintiff's hearing testimony that she could lift up to 15-20 pounds without pain is not substantial evidence of her ability to handle "frequently" and finger "occasionally" in a work setting. SSA guidelines are clear that "RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." SSR 96-8p, 1996 WL 374184, at *2 (emphasis and bold in original). Further, "[a] 'regular and continuing basis' means 8 hours a day, for 5 days a week." *Id.* Plaintiff did not testify (because she was never asked) that she could lift up to 15-20 pounds without pain for up to either 6 or 2 hours of an 8 hour work-day, on a regular and continuing basis for five days a week. It also is not evident (and the ALJ does not explain) how an ability to lift a certain amount of weight, which is an exertional requirement, is relevant to a non-exertional manipulative limitation in the ability to handle and/or finger.

The ALJ's second rationale concerning Plaintiff's purported daily activities also does not support the ALJ's rejection of Dr. Gupta's opinion. The Seventh Circuit has "repeatedly stated … that an ALJ must 'minimally articulate his reasons for crediting or rejecting evidence of disability,'" and thus the court will reverse an ALJ's RFC finding that depends on a claimant's daily activities where the ALJ does "not provide any explanation for his belief that [the claimant's] activities [are] inconsistent with [a medical] opinion." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (internal citations omitted). Here, the ALJ cited to Plaintiff's ability to "handle personal hygiene, cook, do household chores, and play video games" as a reason for rejecting Dr. Gupta's opinion but did not explain his belief that those activities are inconsistent with Dr. Gupta's opinion. The ALJ hinted that his rationale was that these activities discredit the notion that Plaintiff was "*completely* unable to … handle objects." [AR 22 (emphasis added)]. But the ALJ seems to have created a strawman to knock down by characterizing Dr. Gupta's opinion as stating that Plaintiff was "*completely* unable to" handle and/or finger. While Dr. Gupta could have explained his finding more clearly, such an interpretation of his opinion is not reasonable. Dr. Gupta stated that Plaintiff was "unable to do work related activities … due to deformities in both hands." [AR 348]. As the ALJ acknowledged, Dr. Gupta has disability program knowledge, and therefore it must be presumed he is aware that "work related activities" means activities that are undertaken on "[a] 'regular and continuing basis'" for 8 hours a day, 5 days a week. Thus, an accurate reading of Dr. Gupta's opinion is that he found Plaintiff was unable to handle and/or finger for any meaningful or extensive period as would be required in a job.[18] The ALJ's contrary and improbable

---

[18] If Dr. Gupta's opinion were truly ambiguous, the ALJ could have reached out to him for clarification on the subject. *See Barnett v. Barnhart*, 381 F.3d 664, 669-70 (7th Cir. 2004) (finding the ALJ should have contacted claimant's doctor for clarification of her medical opinions, and ask for more detail).

23

interpretation of Dr. Gupta's opinion as saying that Plaintiff could never lift or hold literally anything ever is not supported by a fair reading of the opinion.

Apart from giving two inadequate reasons for rejecting Dr. Gupta's opinion, the ALJ also ignored evidence in the record that called into question the ALJ's findings. Although an ALJ need not discuss every piece of evidence in a claimant's record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *see also Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010) (an ALJ may not cherry-pick evidence from the record to support his conclusion without engaging with the evidence that weighs against his findings). Here, the ALJ omitted any discussion of Dr. Gupta's examination findings regarding Plaintiff's limitations in handling and fingering. Those findings included the following: (1) Plaintiff suffered pain and stiffness in both hands and fingers; (2) her grip strength was a 3 out of 5 bilaterally; (3) she had abnormal fine finger manipulative abilities, including difficulty buttoning, zipping, and picking coins; and (4) her dynamometer testing scores were 9.7 kilograms on the right hand and 8.2 kilograms on the left hand. [AR 345, 347].

The ALJ's failure to discuss these findings in the portion of his decision rejecting Dr. Gupta's opinion as "unpersuasive" might not be error if it were apparent from elsewhere in the decision that the ALJ did in fact consider but rejected those findings for reasons supported by substantial evidence. But that is not the case here. It is true that, earlier in the decision, the ALJ apparently concluded that the evidence in the  record regarding grip strength was inconclusive in that there were findings both of a weakened grip strength and a normal grip strength. From this it might be argued that the ALJ reasonably concluded that Dr. Gupta's grip strength findings were not persuasive (or at least not a sufficient basis for his opinion). But the ALJ's entire discussion of grip strength consisted of merely observing, without further analysis, that Plaintiff "has been noted

for both full and diminished grip strength since her application date." [AR 21]. Upon closer examination (which the ALJ did not conduct), the differing grip strength findings in the record are not of equal persuasive value.

For "diminished" grip strength findings, the ALJ cited (1) Exhibit 3F, p. 3, which is Dr. Gupta's finding of "Grip strength at 3/5 bilaterally" [AR 347]; and (2) Exhibit 12F, p. 22, which is the occupational therapist's finding of "Hand Grasps: Weak but equal bilaterally" [AR 547]. For "normal" grip strength findings, the ALJ cited to (1) Exhibit 10F, p. 104, which shows the physical examination findings of pain specialist Dr. Ho of "Neurologic: The patient has 5/5 strength in all four extremities, including … grip strength" [AR 507], and (ii) Exhibit 12F, p. 38, which shows the "Focused MSK Exam" findings of pain specialist Dr. Shetty of "No weakness to wrist dorsiflexion or grip strength noted" [AR 563]. Dr. Gupta was a consultative examiner who was tasked with measuring Plaintiff's abilities in specific areas, including ability to handle and finger, and the occupational therapist was a specialist, who took precise measurements for purposes of rating current functioning and using that rating to measure improvements that resulted from therapy. Consequently, the findings of these two professionals are more detailed, and indicate that a specific measurable methodology was used to determine grip strength.[19] The same is not true of the findings of the two pain specialists, who did not need precise, reliable grip strength measurements given the purposes for which they were consulted, i.e., pain relief.

---

[19] The ALJ only cited the occupational therapist's general "weak" finding regarding Plaintiff's "hand grasps," which on surface appears to be no more specific or reliable than the similar findings of "normal" grip strength in the medical records of the pain specialists. But the ALJ ignored measurements shown later in the occupational therapist's report indicating a "painful" grip strength of 32.5 pounds on the right hand and 30.6 pounds on the left hand. [AR 548, 549]. The average healthy grip strength for a woman typically measures around 44 pounds. *https://www.jtechmedical.com/blog/120-get-a-grip-what-does-my-grip-strength-reveal-about-my-health#:~:text=The%20average%20healthy%20grip%20strength,a%20variety%20of%20health%20issues* (last visited on 9/21/2022).

The truncated manner in which the ALJ discounted the precise grip strength measurements taken by Dr. Gupta and the occupational therapist is significant because the issue here is Plaintiff's ability to handle and finger. The Bureau of Labor Statistics (BLS) uses the term "fine manipulation" to mean "[p]icking, pinching, or otherwise working primarily with fingers rather than the whole hand or arm as in gross manipulation." *Samuel S.,* 2019 WL 168437, at *7 (quoting the BLS website).[20] The ability to finger "is needed to perform most unskilled sedentary jobs and to perform certain skilled and semiskilled jobs at all levels of exertion." *Herrmann v. Colvin*, 772 F.3d 1110, 1112 (7th Cir. 2014) (quoting SSR 85-15, *Titles II and XVI: Capability to Do Other Work—The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments*, Soc. Sec. Disab. Prac. Appendix J). Handling or "gross manipulation," on the other hand, is "defined as '[s]eizing, holding, *grasping*, turning, or otherwise working with hand(s). Note: Fingers are involved only to the extent that they are an extension of the hand.'" *Samuel S.,* 2019 WL 168437, at *7 (quoting BLS website ) (emphasis added). "'[H]andling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands)'" is also "an essential manipulative activity in a great many jobs." *Herrmann*, 772 F.3d at 1112 (quoting SSR 85-15). A reduced grip strength may suggest a limitation in fingering. *See Samuel S.,* 2019 WL 168437, at *7 (stating it was "reasonable to conclude" from consultative examiner's finding of "4/5 grip strength" with "normal gross manipulation" that "fine manipulation was impaired"). It may also suggest a limitation in handling. *See Hermann,* 772 F.3d at 1112 (finding it reasonable

---

[20] The BLS "is a unit of the United States Department of Labor that serves as the 'principal fact-finding agency for the federal government in the field of labor, economics, and statistics.' The BLS completes occupational requirements surveys that separate the physical demands into 'elements [to] provide a systematic way of describing the physical activities that an occupation requires of a worker.'" *Samuel S.*, 2019 WL 168437, at *7 (quoting the BLS website).

to conclude from consultative examiner's finding of "reduced grip strength" that the claimant "would have trouble 'handling," explaining that "gripping is a form of handling"[21]).

In short, a great deal more analysis of the reduced grip strength findings of Dr. Gupta and the occupational therapist would be needed before the Court could conclude that the ALJ had a logical and supportable basis for rejecting those findings as insignificant to the ALJ's RFC restrictions of frequent handling and occasional fingering. Not only does the ALJ not provide any additional analysis, but immediately after noting the mixed findings in the record regarding grip strength, the ALJ stated: "However, [Plaintiff] is generally noted to otherwise have good strength in her extremities with intact sensation and normal medical reflexes." [AR 21]. To the extent that the ALJ is suggesting that general findings of "good strength in [Plaintiff's] extremities" and/or "intact sensation and normal medical reflexes" cancel out or somehow call into question weak grip strength findings in the record, the ALJ fails to explain how he arrived at that conclusion. The ALJ cites for this statement Dr. Gupta's finding of "full range of motion in all *lower* extremities" and an emergency room record with a general musculoskeletal finding of "Normal ROM, normal strength."[22] The ALJ also cites pain specialist Dr. Ho's neurologic finding of "5/5 strength in all four extremities,[23] and pain specialist Dr. Shetty's findings of "No proximal upper extremity

---

[21] Citing Virgil Mathiowetz *et al*., "Grip and Pinch Strength: Normative Data for Adults," 66 ARCHIVES OF PHYSICAL MEDICINE AND REHABILITATION 69, 71 (1985), *www.fcesoftware.com/ images/5_Grip_and_Pinch_ Norms.pdf* (visited Dec. 4, 2014).

[22] *See* [AR 21 (citing Exhibit 3F, pp. 3-4 [AR 347-348] and Exhibit 10F, p. 95 [AR 498])].

[23] The ALJ does not mention Dr. Ho's additional examination findings on the cited page of (1) "some hypermobile ankles"; (2) "Ambulation and certain activities are guarded"; (3) "The patient exhibits moderate pain with range of motion maneuvers of the cervical spine; and (4) "The patient exhibits moderate pain with range of motion maneuvers of the lumber spine." [AR 507].

27

weakness" and "Intact to light/sharp touch over the bilateral upper and lower extremities."[24] The ALJ does not explain why normal strength in lower or upper extremities, normal general musculoskeletal findings, and/or intact sensations have any bearing on the issue here regarding limitations in handling and fingering caused by congenital hand deformities. *See, e.g., Herrmann*, 772 F.3d at 1112 ("The applicant in our case may have areas of strength and be able to feel things ('normal sensation') without having the grip strength that she'd need at work.").

The ALJ also expanded earlier in his decision on the basis for his more conclusory finding in the later section rejecting Dr. Gupta's opinion that Plaintiff's activities of daily living were inconsistent with the extreme limitation of Plaintiff not being able to work because of the deformities in her hand. Specifically, the ALJ referenced Dr. Gupta's observation of Plaintiff during his examination that she had difficulty buttoning, zipping, and picking up coins, but countered those observations by pointing out that the following day, during her psychological consultative examination, Plaintiff "reported she could do her own unassisted dressing, grooming, and bathing," that she could "prepare simple meals, do light cleaning, and do light shopping," and that she "enjoyed taking care of her dog and playing video games." [AR 21 (citing Exhibit 4F, p. 4 [AR 357])]. But the cited comments were based on Plaintiff's reports with no detailed discussion regarding the frequency with which she did the things in question or whether she had help from her partner in doing them, versus Dr. Gupta's examination findings that were based on his functional testing. Moreover, the ALJ cherry-picks from the psychological consultative examiner's report by omitting that Plaintiff also reported to Dr. Durek that she suffered from chronic hand pain that she rated an 8 out of 10. [AR 355]. Furthermore, the ALJ's citation to Dr. Durek's comments about Plaintiff's reports concerning her physical functioning as evidence to refute

---

[24] *See* [AR 21 (citing Exhibit 10F, p. 104 [507] and Exhibit 12F, pp. 38-39 [563-564])].

Dr. Gupta's actual physical examination findings is not persuasive given that the ALJ later criticized Dr. Gupta for "exceed[ing] the scope of" his consultative examination by commenting on Plaintiff's reports about her psychological functioning in the areas of concentration, memory, and social skills as being within the purview of Dr. Durek's consultative examiner report. *See* [AR 22]. It is inconsistent for the ALJ to find that a report of the physical examiner should not be relied on because it was outside the scope of that examination, when the ALJ relied on a report of the psychological examiner as being supportive of the ALJ's findings even though that report also was outside the scope of the examination.

The ALJ further expanded his discussion of Plaintiff's daily activities by citing the Plaintiff's Function Report, in which the ALJ said Plaintiff reported "she could dress, do her hair, shave, feed herself, prepare simple meals, do dishes, do laundry, complete household chores, shop, use a computer, put together puzzles, and play video games daily." [AR 21 (citing AR 232-235 (Ex. 5E, pp. 3-6))]. However, under well established law, ALJs may not equate daily activities to an ability to perform substantial gainful activity. *Jarnutowski v. Kijakazi*, __ F.4th __, 2022 WL 4126293, at *5 (7th Cir. Sept. 12, 2022). "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons …, and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Here, the ALJ cites to the daily activities reported in Plaintiff's Function Report without explaining the context in which they were reported. For instance, the Function Report did not always ask questions regarding daily activities in a way that would elicit information concerning whether Plaintiff participated in those

activities with or without the help of another person. The questions also did not necessarily elicit information regarding how many hours per day Plaintiff engaged in the reported activity, such as whether she did so continuously for 6 hours (handling) or 2 hours (fingering) per day, five days a week or the equivalent for a 40-hour work week. Nor is it clear from the Function Report whether Plaintiff required any adapted devices in engaging in the activities in question, or whether she had the flexibility to, and did in fact, reduce those activities in response to significant pain she experienced in performing them.

Furthermore, the ALJ cherry-picks from the form, ignoring other responses in which Plaintiff indicated she needed assistance "getting in and out of shower" and "help with cleaning" after using the toilet. With regard to preparing meals, Plaintiff reported she could only prepare "sandwiches and ready to eat meals," and she clarified she could only engage in activities like laundry or dishes for "20 minute sections." Moreover, Plaintiff further clarified her responses in the Function Report during her hearing testimony, when she explained that she required altered silverware to feed herself, and she could not use glassware because she risked dropping it. In short, the ALJ provided no reasoned basis for concluding that the cited daily activities could be translated into an ability to frequently handle and occasionally finger for purposes of performing work on an ongoing and sustained basis. *See, e.g., Minger v. Berryhill*, 307 F. Supp. 3d 865, 872, 873 (N.D. Ill. 2018) (finding that the plaintiff's daily activities did not "display a routine compatible with maintaining a schedule required of work" and that there was "not even a thread of logic [ ], let alone a bridge" in the ALJ's discussion otherwise).

Although the foregoing is more than sufficient to show that the ALJ failed to cite substantial evidence to discount Dr. Gupta's opinion, the ALJ's final citation in support of her finding of a frequent handling and occasional fingering RFC is perhaps least supportive of all. The

ALJ states that, during occupational therapy evaluation, Plaintiff had minimal deficits with gross and fine motor coordination bilaterally.[25] The ALJ does not explain why the occupational therapist's findings regarding Plaintiff's fine motor *coordination* skills were relevant to Plaintiff's functional limitations in handling and fingering. In addition to the absence of any logical bridge, the ALJ's citation to the coordination findings of the occupational therapist is obvious cherry picking. The same page of the occupational therapy records that reports the finding of a minimal deficit in coordination skills also reports something called a TAM score. TAM refers to "Total Active Motion," and, according to the American Society for Surgery of the Hand (ASSH), is a frequently referenced method of measuring range of hand motion.[26] A score is calculated for each finger and is expressed as a percentage of a normal range, with a "Good" rating being >75%, a "Fair" rating being >50%, and a "Poor" rating being <50%.[27] Plaintiff's TAM scores for each finger beginning with the thumb were: right hand: 65%, 63%, 63%, 70%, and 72% (all "Fair" ratings)[28]; and, for the left hand: 76%, 35%, 63%, 40%, and 88% (two "Good" ratings, two "Poor" ratings, and one "Fair" rating)[29]. Again, the ALJ did not need to discuss every piece of evidence in the record, but he "may not select only the evidence that favors his ultimate conclusion." *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984). The TAM scores concerning range of motion deficits for each of Plaintiff's fingers are logically as relevant if not more relevant to

---

[25] [AR 21 (citing Exhibit 12F, pp. 23-24 [AR 548-549])].

[26] *See https://bracelab.com/clinicians-classroom/tendon-outcome-assessments* (last visited on 9/21/2022).

[27] *See id.*

[28] [AR 548].

[29] [AR 549].

Plaintiff's handling and fingering abilities than the finding regarding fine motor coordination skills that the ALJ cites.

Beyond this blatant example of cherry picking, it is difficult to see how the ALJ could cite to the occupational therapy records at all as support for his RFC findings in fingering and handling, when those records clearly indicate that the Plaintiff was having difficulties with basic life activities in her own home (i.e., in ADLs and IADLs). The overarching picture that emerges from the occupational therapy records is that an assessment of Plaintiff's ability to use her hands *must* take into account the pain that such use causes her. Thus, the occupational therapy records invoked by ALJ to support his frequent handling and occasional fingering RFC include observations by the therapist (not acknowledged or discussed by the ALJ) such as Plaintiff was "not able to complete" the therapy because she was "not able to utilize two hands to complete tasks"; Plaintiff "needs assistance with ADLs" including toileting and grooming; Plaintiff had to stop and needed extra breaks after attempting to cut with scissors and twist nuts onto bolts; and Plaintiff's gross manipulative therapy tasks were completed using a "reacher" device. If Plaintiff required breaks in engaging in these activities and a "reacher" device during a therapy session, it is hard to imagine how these records support the notion that she could, as the ALJ concluded, "handle" items for 6 hours or "finger" for more than 2 hours of an eight-hour work day. Put simply, the ALJ's context-free invocation of Plaintiff's daily activities and his cherry-picking of Plaintiff's occupational therapy records do not provide a logical reason for dismissing Dr. Gupta's opinion.

### C.    DR. WOOD

Dr. Wood's opinion was essentially the same as that of Dr. Gupta. Dr. Wood opined that Plaintiff "will really be unable to perform any kind of duties or activities that would require significant lifting, pushing, pulling or any activities [that] require[ ] dexterity with the use of the

hands." [AR 364]. Virtually everything discussed about the ALJ's treatment of Dr. Gupta's opinion can also be said about the ALJ's treatment of Dr. Wood's opinion. For instance, the ALJ said that Dr. Wood's opinion was "less persuasive" because, among other things, "[h]e did not inquire as to [Plaintiff's] daily activities, which demonstrate a broad range of functioning"; "[h]er occupational therapist observed only minimal deficits with gross and fine motor *coordination* bilaterally"; and his conclusion that Plaintiff "is *completely* unable to perform any activities requiring manual dexterity is not consistent with the record." [AR 21-22 (emphasis added)]. The discussion above regarding the ALJ's rejection of Dr. Gupta's opinion, which shows that similar reasons for rejecting that opinion are not supported by the record, also applies to the ALJ's rejection of Dr. Wood's opinion.

In addition, the ALJ discounted the fact that Dr. Wood is a hand specialist by stating that "he offered []his opinion after a brief examination of claimant." [AR 21]. This reason was not a sufficient basis for rejecting Dr. Wood's opinion, however. First, Dr. Wood's opinion was not based solely on a "brief examination"; it also included his review of Plaintiff's hand x-rays. As an expert in orthopedic matters, Dr. Wood could credibly review those x-rays and offer an opinion of functional limitations based on that imaging review. Second, there is no reason why further examinations would have been beneficial or add anything to Dr. Wood's ability to apply his expertise to form an opinion regarding Plaintiff's functional limitations. Third, Dr. Wood's expert opinion was that any further treatment of Plaintiff would not be beneficial to Plaintiff's situation.

The only other reason given by the ALJ for finding Dr. Wood's opinion "less persuasive" was the ALJ's characterization of the opinion as "vague" because Dr. Wood did not "define the term 'significant.'" [AR 21]. By this comment, the ALJ is focusing on the sentence using the word "significant" in isolation. It is clear from the immediately preceding sentences that Dr. Wood was

saying that Plaintiff should "be considered disabled" because she had a "significant [inability] to lift[ ], push[ ], pull[ ] or dexterity with the use of the hands," which means she is "unable to perform any kind of [work] duties or activities." [AR 364]. In other words, Dr. Wood's opinion was that Plaintiff is unable to perform duties or activities *in a work-related context*. And an ability to do something in a work-related context is generally understood to mean an ability to do them consistently and repeatedly over the course of 8 hours a day or a 40 hour work week. Indeed, in *Herrmann*, the Seventh Circuit did not find that a medical expert's opinion "that the applicant would have *trouble* 'handling'" to be vague. 772 F.3d at 1112. Instead, the court said the ALJ failed to consider the expert's opinion, which the court said supported a finding that the plaintiff was likely to have "*[s]ignificant* limitations of reaching or handling" that "may eliminate a large number of occupations a person could otherwise do." *Id.* (emphasis added).[30]

### D.   STATE AGENCY REVIEWER'S OPINIONS

If a medical opinion "is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); *see also Clifford*, 227 F.3d at 870 (finding error where the ALJ merely substituted his judgment for that of the plaintiff's treating physician when the ALJ accorded the opinion little or no weight without citing to any medical report or opinion that contradicted it (citing, *inter alia, Rohan v. Chater,* 98 F.3d 966, 968 (7th Cir. 1996) ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."), and *Herron v. Shalala*, 19 F.3d

---

[30] Once again, if the ALJ truly could not discern the meaning of Dr. Wood's opinion, rather than dismiss it as "vague," he could and should have attempted to contact him for clarification. *See Barnett*, 381 F.3d at 669-670.

329, 333 (7th Cir. 1994) (noting that the ALJ cannot, without adequate explanation, discount an uncontradicted, dispositive medical opinion))).

Plaintiff argues that the ALJ here discounted the medical opinions of Dr. Wood and Dr. Gupta in the face of no contrary opinion or other compelling evidence in the record. But Plaintiff fails to discuss the agency reviewers' opinion in her brief. The state agency reviewers at the initial and reconsideration levels found that Plaintiff's abilities included unlimited handling and frequent fingering. The ALJ found the state agency reviewers' opinions "somewhat persuasive." The ALJ considered the agency reviewers' opinion more persuasive than the opinions of Dr. Gupta and Dr. Wood for four reasons: the reviewers have disability program knowledge; they described objective evidence to support their RFC findings; their opinion was generally supported by imaging studies and physical examination signs; and, their opinion was consistent with Plaintiff's conservative treatment history and her daily activities. [AR 22]. The ALJ explained that he imposed limitations of frequent handling and occasional fingering—as opposed to the state agency reviewers' less restrictive RFC recommendations of unlimited handling and frequent fingering—because the agency reviewers "did not have the opportunity to review evidence received at the hearing level, and they did not listen to the claimant's testimony." [*Id.*].

The ALJ did not specifically discuss the objective evidence or Plaintiff's daily activities that the agency reviewers cited as supportive of their RFC finding. But that evidence and those activities have already been addressed in this opinion and shown not to support the ALJ's handling and fingering findings, let alone the less restrictive ones of the agency reviewers. The "ALJ's conclusory statement that these findings were consistent with the record when in fact they are contradicted by it was not enough to justify elevating [the agency reviewer's] opinion over all others." *Beardsley*, 758 F.3d at 839.

The only additional evidence cited by the ALJ in concluding that the agency reviewers' opinion was more persuasive than that of either Dr. Gupta or Dr. Wood is a vague reference to Plaintiff's "conservative treatment history," which is not further explained anywhere in the decision. The Seventh Circuit has noted that "infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). But the ALJ "must not draw inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Id.* (internal quotation marks and citation omitted). Here, although the ALJ alluded to a conservative treatment history, he made no attempt to explore the issue. The record indicates that beginning in 2019 Plaintiff's hand pain had gotten significantly worse and that she also stopped working about then. She then sought out more frequent treatment for the pain, including visiting a number of specialists, who told her there was very little that could be done for her situation. Plaintiff discontinued occupational therapy with two sessions remaining because she said she could not tolerate the pain.

Social Security regulations state that the ALJ must "consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities," and that "[]persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent. SSR 16-3p, *Titles II & XVI: Evaluation of Symptoms in Disability Claims*, 2017 WL 5180304, at *9 (S.S.A. Oct. 25, 2017). Further, an ALJ must "not find an individual's symptoms inconsistent with the evidence in the record on th[e] basis [of

infrequently seeking treatment] without considering possible reasons [she] may not … seek treatment consistent with the degree of [her] complaints." *Id.* To satisfy this rule, the ALJ "may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why [she] has not complied with or sought treatment in a manner consistent with [her] complaints." *Id.* In evaluating the claimant's treatment history, the ALJ should consider that the claimant "may have structured [her] activities to minimize symptoms to a tolerable level by avoiding physical activities … that aggravate [her] symptoms," or that "[a] medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual." *Id.* at *9-10. These factors are not addressed by either the ALJ or the agency examiners. Indeed, noticeably absent from the ALJ's analysis or that of the agency examiners is any discussion of Plaintiff's pain. *See* SSR 96-8p, 1996 WL 374184, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairments(s), *including any related symptoms*, *such as pain*, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." (emphasis added)); *Clifford*, 227 F.3d at 871 ("the ALJ did not, but should have, considered *all* relevant evidence (including [the plaintiff's] complaints of disabling pain) in weighing whether [the plaintiff] is disabled from repetitive work as found by [the plaintiff's treating orthopedic specialist]," who had "opined that [the plaintiff] was unable to perform work that required repetitive use of her hands") (emphasis in original)). The ALJ focused exclusively on what Plaintiff was capable of doing with her hands, without any indication of whether consideration had been given to how much pain it would cause her if she used her hands as much as the ALJ said she was capable of using them.

In sum, the ALJ's findings that Plaintiff could handle frequently and finger occasionally cannot be upheld for the reasons given in the ALJ's decision. The ALJ erred in relying on the agency reviewers' finding of a conservative treatment history as evidence that supported those opinions being more persuasive than the opinions of Dr. Gupta and Dr. Wood. That Plaintiff did not seek additional treatment or her doctors did not recommend less conservative forms of treatment are not sufficient reasons to discount Dr. Gupta's and Dr. Wood's opinion. Beyond noting Plaintiff's daily activities and conservative treatment history, the agency reviewers "provided no explanation for thinking" that Plaintiff was able to handle without limitation and to finger frequently. *Beardsley*, 758 F.3d at 839. Further, whether considered individually or collectively, Plaintiff's descriptions of her day-to-day activities, the opinion of the state agency reviewers, and Plaintiff's supposedly conservative treatment ,were not enough to support a logical bridge from the evidence to the ALJ's conclusion.

Lastly, the Court considers Plaintiff request that the ALJ's decision be reversed and an award of benefits ordered. "It remains true that an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Allord v. Astrue*, 631 F.3d 411, 417 (7th Cir. 2011). Plaintiff points to the "fairly-clearly disabling opinions" of Dr. Gupta and Dr. Wood. "A claimant, however, is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work.' Under the Social Security regulations, the Commissioner is charged with determining the ultimate issue of disability." *Clifford*, 227 F.3d at 870.[31] As the remand here comes under the Seventh Circuit's

---

[31] This does not mean that the ALJ may disregard the opinions of Dr. Gupta and Dr. Wood because they opined that Plaintiff is unable to work. Notwithstanding 20 C.F.R. 416.920b(c)(3)(i) (which describes evidence that is "inherently neither valuable nor persuasive" such as a statement that a claimant is or is not disabled or able to work), the ALJ must consider the reasons stated in the

"logical bridge" requirement, an award of benefits is not appropriate without further administrative proceedings. Instead, remand is required so that the ALJ may either adopt RFC findings consistent with the opinions of Dr. Gupta and Dr. Wood, or else provide some evidence-based, context-inclusive rationale for dismissing the opinions.

<u>**CONCLUSION**</u>

Based on the foregoing, the Commissioner's final decision is **REVERSED AND REMANDED** for further proceedings. The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Plaintiff and against Defendant.

ORDERED this 22nd day of September, 2022.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT

---

medical opinions for the conclusion that Plaintiff is unable to work. *See, e.g., Tameka L. v. Kijakazi,* No. 3:21CV900, 2022 WL 4092998, at *7 (N.D. Ind. Sept. 7, 2022).